**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| PRUDENTIAL INSURANCE COMPANY OF AMERICA | CIVIL ACTION NO. 25-1160 |
| VERSUS | JUDGE ALEXANDER C. VAN HOOK |
| APRIL KELLY, ET AL. | MAGISTRATE JUDGE HORNSBY |

# MEMORANDUM RULING

The Prudential Insurance Company of America ("Prudential") filed this lawsuit to determine who owns the proceeds of a life insurance policy issued to Betty Hendricks ("Hendricks"). On one side are Hendricks's two children, April Kelley ("Kelley")[1] and Robert Daniels ("Daniels"), and on the other side are a father and son, Quincy Miles ("Quincy") and Qylan Miles ("Qylan"), who have no familial relationship to Hendricks. Quincy and Qylan (collectively, "Miles Family") represent themselves and have littered the docket with indecipherable pleadings. But, despite generous handholding, the Miles Family never filed the first thing required of defendants—an answer. Prudential, Kelley, and Daniels have asked for a default judgment which is now pending before the Court. Record Document 31. For the following reasons, the requests for default judgment are **GRANTED**.

[1] The Court notes that when the Interpleader Complaint was initially filed, Record Document 8, the complaint referred to April Kelly f/k/a April Wayne and spelled the name as "April Kelly." Since that initial filing, counsel for Ms. Kelley and Mr. Daniels has consistently spelled her name as "April Kelley" and the Court has used that spelling throughout this memorandum ruling.

**Background**

Prudential provides group life insurance benefits to the U.S. Department of Veterans Affairs pursuant to the Servicemembers' Group Life Insurance statute, 38 U.S.C. § 1965, et seq. Record Document 8 at 3. The group policy provides coverage to veterans who separate or are released from active duty. *Id.* Hendricks had been one such veteran. *See id.* At the time of her death, Hendricks had $150,000 of life insurance coverage under the group policy. *Id.*

Hendricks first applied for life insurance benefits on April 21, 2010. Record Document 8-1 at 5. She designated her children, Kelley and Daniels (collectively, "Hendricks Children"), as the beneficiaries. *Id.* at 3. Over a decade later, on September 9, 2024, Prudential received a beneficiary designation change form that removed Kelley and Daniels and instead named Quincy and Qylan as the principal beneficiaries. Record Document 8-2 at 3, 5. Hendricks died on January 23, 2025. Record Document 8-3. After her death, Kelley and Daniels submitted a claim for Hendricks's life insurance benefits. *Id.* They argued that the change of beneficiary in September 2024 naming Quincy and Qylan had been invalid. *Id.*

Prudential filed an interpleader complaint that named Kelley, Daniels, Quincy, and Qylan as defendants. Record Document 8. Prudential does not dispute that it must pay the $150,000 group life insurance benefits. Record Document 8 at 4. But because it faces competing claims from the Hendricks Children and the Miles Family, Prudential has not paid the benefit and asks that the Court determine the rightful owners. *Id.* As Prudential succinctly put it, if the September 2024 change of

beneficiary is valid, the benefits belong to Quincy and Qylan. *Id.* If invalid, Kelley and Daniels are entitled to the proceeds. *Id.*

**I. Response of the Hendricks Children**

Kelley and Daniels responded to the interpleader complaint and pleaded that their mother lacked capacity to change her beneficiaries. Record Document 17 at 9. Hendricks, as her children acknowledged, struggled with drug abuse and addiction throughout her life. *Id.* at 1. But her drug dependence "became critical" in January 2024 after her husband's death. *Id.* at 6. The Hendricks Children alleged that Quincy and Qylan, who have a history of drug trafficking arrests, supplied their mother with "cocaine and other illegal drugs to incapacitate her, gain control over her, and steal her money." *Id.* at 10. By May 2024, Hendricks had suffered a stroke. Record Document 17-2.

Then, on July 15, 2024, Hendricks purportedly signed a power of attorney document in favor of Quincy. Record Document 17 at 1. Alarmingly, Hendricks stated in the power of attorney that she suffered from a "mental condition that would hinder [her] from properly executing [that] document." *Id.* at 3. Still, less than two months after Hendricks affirmed that she suffered a mental condition that hindered her abilities, on September 4, 2024, Hendricks allegedly changed the beneficiaries of her life insurance policy. Record Document 8-2 at 3. Her children would get nothing, while Quincy would receive 85% of her benefits and Qylan would receive 15%. *Id.*

A couple of weeks after supposedly changing her beneficiaries, Hendricks was evaluated at the hospital. Record Document 17-2. On September 22, 2024, the

medical provider noted that Hendricks had "severe dysarthric speech," and during an aphasia test, she "was unable to repeat phrase and the sentence and ending sounds were omitted for the words." *Id.* She also "was unable to perform the task words were unintelligible[,]" and when Hendricks tried to write, "her grip was awkward and words were not legible." *Id.*

The Hendricks Children petitioned a state court to interdict their mother in December 2024 after she had been hospitalized. Record Document 17-3 at 1. A court-appointed physician evaluated Hendricks in January 2025. Record Document 17-4. He determined Hendricks suffered from a list of maladies, including stroke-induced quadriplegia, stroke-induced aphasia, chronic encephalopathy, and chronic cocaine dependence. *Id.*

## II. Disregard of the Miles Family

Quincy and Qylan refused to waive service of the interpleader complaint, but Prudential had accomplished service on both by November 2025. Record Documents 15, 16. They took no action and made no appearance for more than 120 days, until finally, on March 12, 2026, three handwritten documents appeared. *See* Record Documents 22, 23, 26.

The first document was titled "Response to Interpleader Complaint Motion to Realign Parties and Statement of Claim and Crossclaim." Record Document 22. It was handwritten, one page, and said that "Quincy Miles and Qylan Miles respond…as follows." *Id.* The document had not been signed. *See id.* The second document was called "Story Line with Betty Hendricks." Record Document 23. Like the first, it was

one page long, handwritten and unsigned. *Id.* The third document named "Affidavit of Quincy Miles," although much longer, was also unsigned. Record Document 24.

Because none of the documents were signed, the Clerk of Court issued "Notice of Deficient Document" to the Miles Family. Record Document 25. The notice explained that the three documents filed on March 12 had been deficient because they lacked the original signature Federal Rule of Civil Procedure 11 required. *Id.* The Miles Family had three days to correct the deficiency. *Id.* They did not. And two weeks later, no corrective documents had been filed, so the Magistrate Judge struck the deficient pleadings from the record. Record Document 27.

Almost two months passed and neither Quincy nor Qylan filed an answer. Thus, on May 14, 2026, Prudential requested the Clerk of Court enter default against them pursuant to Federal Rule of Civil Procedure 55(a). Record Documents 28, 29. The Clerk of Court entered default that same day. Record Document 30.

The following day, May 15, 2026, the Hendricks Children moved for default judgment. Record Document 31. The Clerk of Court issued a notice setting for the default judgment motion and gave the Miles Family twenty-one days to oppose the motion. Record Document 32. Shortly after the deadline, Quincy filed a letter with the statement "here is my signature if I failed to sign it[.]" Record Document 34. His signature then followed. *Id.* Curiously, though, the letter had been addressed to an attorney not enrolled in this case. *Id.* The letter did not address his delay in responding to the complaint or otherwise state the allegations he denies or raise any defenses. *Id.* For his part, Qylan filed nothing.

Hesitant to enter default judgment against pro se litigants, the undersigned issued a plainly worded, helpful order that pointed Quincy and Qylan toward the proper next steps. Record Document 35. The Hendricks Children, not wrongly, referred to that order as "generous handholding." Record Document 41 at 5. The order stated:

> **IT IS ORDERED** that Quincy Miles and Qylan Miles file, no later than July 27, 2026, a Motion to Set Aside Entry of Default that shows good cause for their failure to answer the interpleader complaint and crossclaim. The motion should answer at least these questions: (1) Did you deliberately fail to respond to the claims, or did the failure result from a mistake or misunderstanding? (2) Would setting aside the default unfairly harm the other parties? (3) Do you have a real defense to the claims? (4) Did you act quickly to fix the default once you learned of it? Quincy and Qylan Miles must provide a narrative answer and factual support for each question.
>
> The defendants may file separate motions or a joint motion. If filed separately, each defendant must sign his own pleading. If filed jointly, both defendants must sign the pleading.
>
> **IT IS FURTHER ORDERED** that Quincy Miles and Qylan Miles file, no later than July 27, 2026, a Motion for Leave to File an Answer with the proposed answer attached as an exhibit. An answer is a written response to the complaint. The answer must admit or deny the allegations of the complaint and state in "short and plain terms" any defenses to each claim.
>
> The defendants may file separate answers or a joint answer. If filed separately, each defendant must sign his own pleading. If filed jointly, both defendants must sign the pleading.

Record Document 35 at 2-3. Once again, Quincy and Qylan did not comply.

Over the last two months, Quincy has filed a "Motion to Stay Judgment," a "Motion to Compel Review and Judgment," and a "Motion to Set Aside Entry of Default." Record Documents 38, 44, 53. Although legible, the substance of Quincy's handwritten motions is largely unintelligible. Even taken liberally, Quincy at best seems to say that he is incarcerated and has limited resources. *See, e.g.*, Record Document 38 at 2 ("[B]ecause of the fact of his incarceration thereas [sic] the Petitioner is restricted on resources and ability being at the mercy of the Department of Corrections….").

In these motions, Quincy does not deny the allegations against him or state his defenses. The closest he came is this sentence: "[Quincy] was designated appointed by Mrs. Hendricks to the stewardship as employed to manage the estate and her domestic concerns, a subsidiary furshing [sic] and and [sic] support while living, that she was decisive, coherent, fully aware, logical, receptive to the idea as to Quincy Miles being heir over her possession[.]" Record Document 53 at 4. This sentence and most of the arguments in his motion relate more to the estate litigation pending in state court than the change of beneficiary designation Hendricks made on her life insurance policy.

Since this Court's last order two months ago, Qylan has filed two letters. Record Documents 43, 49. The first letter stated that Qylan, like his father, is incarcerated and has limited access to legal resources. Record Document 43 at 2. In the second letter, Qylan notified the Clerk of Court that his address had changed and stated he has "a legitimate defense to the claims[.]" Record Document 49 at 2. He

further elaborated with nothing more than: "my father and I provided care for Betty Hendricks, and I believe the facts and evidence will support my position." *Id.* For their parts, Prudential and the Hendricks Children urged the Court to issue a default judgment against the Miles Family. Record Documents 33, 41, 45, 48, 52.

**Jurisdiction**

To start, "the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties" before entry of default "against a party who has failed to plead or otherwise defend[.]" *Sys. Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy*, 242 F.3d 322, 324 (5th Cir. 2001). In this case, the Court has original jurisdiction under 28 U.S.C. § 1331 because the underlying claims involve rights arising under federal law, that is, the Servicemembers' Group Life Insurance Statute, 38 U.S.C. § 1965, et seq. The Court has personal jurisdiction over the parties because they reside in Louisiana and have been served with a summons or have waived service. Fed. R. Civ. P. 4(k)(1)(A); Record Documents 13-16.

**Standard**

Default judgments are disfavored. *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). The United States Court of Appeals for the Fifth Circuit has emphasized that such judgments "are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001). The Fifth Circuit has "adopted a policy in favor of resolving cases on their merits and against the use of default judgments." *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496 (5th Cir. 2015). Ultimately, though, the entry

of a default judgment lies within the district court's discretion. *Lindsey*, 161 F.3d at 893.

**Analysis**

Federal Rule of Civil Procedure 55 authorizes district courts to enter a default judgment against a defendant who fails to defend an action. The process for default involves three steps: (1) the defendant's default; (2) the entry of default; and (3) the entry of default judgment. *N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996). A default occurs when the defendant does not respond or otherwise defend against the complaint. *Id.* An "entry of default" is the notation the clerk makes after the default is established by affidavit. *Id.* After the default has been entered, the plaintiff may then apply for a default judgment. *Id.*

In determining whether a default judgment should be entered, courts have developed a three-part analysis. *See, e.g.*, *Alvarado Martinez v. Eltman Law, P.C.*, 444 F. Supp. 3d 748, 752 (N.D. Tex. 2020). Courts first consider whether the entry of default judgment is procedurally warranted. *Id.* Next, courts assess the substantive merits of the plaintiff's claims and determine whether there is a sufficient basis in the pleadings for judgment. *Id.* And lastly, courts determine what form of relief the plaintiff should receive. *Id.*

**I. Default Judgment is Procedurally Warranted**

The six *Lindsey* factors guide whether a default judgment is procedurally warranted. *See Lindsey*, 161 F.3d at 893. These factors ask: (1) whether material issues of fact exist; (2) whether there has been substantial prejudice; (3) whether the

grounds for default are clearly established; (4) whether the default was caused by a good faith mistake or excusable neglect; (5) the harshness of a default judgment; and (6) whether the court would think itself obliged to set aside the default on the defendant's motion. *Id.* Here, these factors weigh in favor of finding that default judgment is procedurally warranted.

First, no material issues of fact exist because Quincy and Qylan have not filed a responsive pleading. *See Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact.").

Second, Quincy and Qylan have caused substantial prejudice to the Hendricks Children because their refusal to defend has brought the adversary process to a halt. *See, e.g.*, *Ins. Co. of the W. v. H&G Contractors, Inc.*, No. 10-390, 2011 WL 4738197, at *3 (S.D. Tex. Oct. 5, 2011) (holding that a defendant's failure to respond prejudiced the plaintiff's interests and "threatens to bring the adversary process to a halt.").

Third, the grounds for a default judgment are well established. Quincy and Qylan filed their first attempt at an answer more than 120 days after being served with the interpleader complaint. Record Documents 22-24. Far longer than the federal rules allow. Federal Rule of Civil Procedure 12(a)(1)(A)(i) ("A defendant must serve an answer within 21 days after being served with the summons and complaint."). After the Magistrate Judge struck that initial answer, Quincy and Qylan never filed another, even after the undersigned provided them with the

opportunity and explained exactly what they needed to do. *See* Record Document 35 at 2-3.

Fourth, the failure of Quincy and Qylan to defend did not result from a good faith mistake or excusable neglect. Both argue that their errors resulted from being incarcerated and having limited access to resources. But the Court is not persuaded. Quincy and Qylan's filings, although difficult to discern, demonstrate that they have access to a law library because they are full of citations. *See, e.g.* Record Document 44 at 1. While incarceration could delay their filings, the Court has afforded them more than enough time to account for these delays and given them a second chance to remedy their mistakes.

The final two elements also weigh in favor of a default judgment. Although a default judgment is a drastic remedy, no circumstances provide good cause to set aside the default. Mindful that it must be especially hesitant to enter a default judgment against pro se defendants, the undersigned invited the Miles Family to articulate good cause. Record Document 35. That order posed the elements of good cause in a simple, question-style format for them to answer. *Id.* at 2-3. But they did not. At best, both Quincy and Qylan blame their incarceration status for their failure to defend this case. That is not enough to preclude a default judgment. Deadlines have been extended to account for the delays common in prisoner litigation. Moreover, Quincy has filled his pleadings with legal citations showing that he has abundant access to legal resources. As the Fifth Circuit has held, a "pro se litigant gets a liberal reading of his pleadings, but the basic procedural obligations still apply." *Propes v.*

*Quarterman*, 573 F.3d 225, 231 (5th Cir. 2009). Neither Quincy nor Qylan has ever filed a signed short and plain statement denying the allegations against them and raising their defenses. Fed. R. Civ. P. 8, 11. Thus, entry of default judgment against them is procedurally warranted.

## II. The Pleadings Offer a Sufficient Basis for Judgment

When a default has been entered, the factual allegations of the complaint are taken as true. *Nishimatsu* 515 F.2d at 1206. But that does not mean the plaintiff is entitled to default judgment "as a matter of right." *Ganther v. Ingle*, 75 F.3d 207, 212 (5th Cir. 1996). The pleadings must have a sufficient basis for the entry of judgment, and only well pleaded facts, not conclusions of law, are presumed true. *Nishimatsu* 515 F.2d at 1206.

The Court finds that the Response to Interpleader Complaint, Record Document 17, filed by the Hendricks Children has a sufficient basis for the entry of default judgment. Their statements when taken as true establish that Kelley and Daniels are the proper beneficiaries of Hendricks's life insurance proceeds.

Hendricks's original application for life insurance designated Kelley and Daniels as her sole beneficiaries. Record Document 8-1 at 3. That application was dated April 21, 2010. *Id.* at 5. Based on the factual allegations, no concerns about Hendricks's capacity to contract existed at that time. But fourteen years later, when she allegedly executed the change of beneficiary form, Hendricks was "deprived of reason" and lacked capacity. La. Civ. Code art. 1918.

Louisiana Civil Code Article 1918 decrees that "[a]ll persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting." When taken as true, the Hendricks Children's statements establish Hendricks had been deprived of reason. Hendricks purportedly executed the change of beneficiary form on September 4, 2024. Record Document 8-2 at 2. By that time, Hendricks had already attested that she suffered from a "mental condition that would hinder [her] from properly executing…" legal documents. Record Document 17-3 at 11. Then, at a medical appointment soon after the change in beneficiary, her provider recognized that Hendricks's stroke symptoms had gotten worse. Record Document 17-2. During an aphasia screening test, Hendricks could not repeat words, make the ending sound for words, could not describe a picture, had unintelligible speech, and when she tried to write, the words were not legible. *Id.*

The Court holds that the factual statements in the Response to Interpleader Complaint, when presumed true, establish that Hendricks lacked capacity to execute the change of beneficiary form on September 4, 2024. Therefore, the original beneficiary designation on April 21, 2010 is effective, and Kelley and Daniels are the proper beneficiaries of Hendricks's life insurance benefits.

## III. Prudential, Kelley, and Daniels are Entitled to Relief

Lastly, this Court must determine what form of relief is appropriate. *Martinez*, 444 F. Supp. 3d at 752. Normally, a hearing is needed to award damages but that rule "is subject to an exception where the amount claimed is a liquidated sum or one capable of mathematical calculation." *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993).

Here, the damages can be awarded without a hearing because the action concerns a liquidated amount—the life insurance policy proceeds of $150,000. Therefore, Prudential is entitled to deposit that amount into the registry of the court, and Kelley and Daniels will be entitled to disbursement of that benefit.

**Conclusion**

Based on the foregoing analysis, **IT IS ORDERED** that the Application for Default Judgment, Record Document 31, is **GRANTED**. A judgment consistent with this ruling will be issued forthwith.

**DONE AND SIGNED** at Shreveport, Louisiana, this 21st day of September, 2026.

Alex C. Van Hook

ALEXANDER C. VAN HOOK
UNITED STATES DISTRICT JUDGE